IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **EVAN J. LIGHTNER,** | : | |
| | : | Case No. 14-CV-2087 |
| **Plaintiff,** | : | |
| | : | JUDGE ALGENON L. MARBLEY |
| v. | : | |
| | : | Magistrate Judge Jolson |
| **CB&I CONSTRUCTORS, INC.,** *et al.*, | : | |
| | : | |
| **Defendant.** | : | |

## OPINION & ORDER

Before the Court is the Motion for Summary Judgment filed by Defendant CB&I Environmental and Infrastructure, Inc. (Doc. 36). It is fully briefed and ripe for review. For the reasons that follow, the Court **GRANTS in part and DENIES in part** the motion.

### I. BACKGROUND

### A. Factual Background

Plaintiff Evan J. Lightner has been employed for the majority of his career in the construction and solid waste industries. (Lightner Dep., Doc. 48-1 at 20.) He has held several supervisory positions in the field, and has received special training and certification as required by the Occupational Health and Safety Administration ("OSHA") for such work. (*Id.* at 19.) On July 9, 2009, Plaintiff accepted an offer to work as a Site Superintendent for Defendant. (Offer Letter, Doc. 48-2.) In that position, he was responsible for managing and supervising solid waste and landfill development projects. (Lightner Dep., Doc. 48-1 at 41.) His responsibilities also included ensuring safe work practices and compliance with OSHA requirements. (*Id.* at 50.)

Plaintiff was by all accounts and at all times a competent, diligent and valuable employee. Annual performance evaluations from 2009, 2010, 2012, and 2013 indicate that he

met or exceeded all expectations. (*See* Performance Evals., Docs. 48-3-6.) Josh Broggi, one of Plaintiff's supervisors and Project Manager in the Solid Waste Group, testified at deposition that Plaintiff was hardworking, passionate, and safety conscious. (Broggi Dep., Doc. 48-7 at 33-34.)

In August of 2011, Plaintiff's wife was diagnosed with cancer. (Lightner Dep., Doc. 40-1 at 58.) Operations Manager (and Plaintiff's supervisor) Mike Mehalic told him that Defendant would be "more than happy" to help Plaintiff take care of his wife. (*Id.* at 59.) He directed Plaintiff to human resources, and Plaintiff was approved to take his requested intermittent leave through October 31, 2011. (*Id.* at 60, 62.) Plaintiff was "very happy" with the support he received from Defendant during that time. (*Id.* at 64.)

In 2012, Greg Cooper replaced Mehalic as Operations Manager for Defendant's Solid Waste Construction Group. (Cooper Dep., Doc.48-8 at 32-33.) Plaintiff and his coworkers and supervisors worked on landfill projects. To the uninitiated, solid waste landfills require regular monitoring. If not properly vented, they accumulate gas and can create hazardous, sometimes explosive, conditions. The Solid Waste Construction Group is responsible for ensuring that does not happen. (*Id.* at 33, 35.)

In July or August of 2013, Plaintiff raised concerns about Defendant's Maine Crossroads Landfill Project. (Lightner Dep., Doc. 48-1 at 106.) He noticed unsafe dump truck operations, and he discussed his concerns with Broggi "at great length." (*Id.* at 107.) Broggi assured him that, even though they had no OSHA training and were not certified by Defendant to operate the equipment, the truck operators had sufficient construction experience and knowhow. (*Id.* at 107-08.) Plaintiff expressed similar concern via emails to Broggi and Cooper about other workers who welded pipes and were similarly unqualified and untrained. (*Id.* at 108-09.) In October of 2013, Plaintiff and others moved to work on a project in Miami, Florida. (*Id.* at 109.) When he

2

arrived on site, Plaintiff noticed the same untrained and uncertified workers welding, and he reiterated his concerns to Broggi. (*Id.*) Broggi and Cooper told Plaintiff several times that it was too costly to have the employees trained and certified. (*Id.* at 111.) In response, Plaintiff sent "numerous" emails to both again expressing his concern. (*Id.* at 112.) He also had telephone and in-person conversations with Division Safety Manager Greg McElroy, and McElroy told him that he had discussed Plaintiff's safety concerns with Broggi and Cooper, and he promised that the employees would be trained "in the very near future." (*Id.*)

The employees were not trained and, by the end of the month, their performance had deteriorated, posing a risk so severe as to warrant dismissing them or shutting down the jobsite completely. (*Id.* at 112-13.) Plaintiff again expressed his concern via email and phone calls to Cooper and others. Cooper became upset, and flew immediately to Miami from Ohio to witness the situation firsthand. (*Id.* at 113.) Cooper observed, among other displays of incompetence, employees unable to operate an off-road dump truck safely and without causing damage. (*Id.* at 113-14.) Cooper was nonetheless unconcerned, and he told Plaintiff that it would be easier to hire five of the untrained employees and get rid of Plaintiff, which Plaintiff understood as a threat to his job security. (*Id.*) Cooper also said that the employees were the best Defendant could afford and still turn an adequate profit. (*Id.* at 114.)

Defendant had keen reason to ensure profitability—during this time it was in the process of acquiring another company, and Cooper told Plaintiff that they needed to "do whatever was possible" to get through the transition period. (*Id.* at 115.) Consequential here is that "whatever was possible" included not accurately reporting safety incidents. (*Id*.) For example, at one point untrained employees backed over the front of the bulldozer that Plaintiff was operating. (*Id.* at 116.) Normally, Plaintiff would report such an incident by calling a 1-800 hotline and then fill

out a formal incident report. (*Id.* at 117-18.) Because the incident resulted in severe damage to tires costing several thousand dollars, a write-up would have been considered a "major safety incident" involving damage to company property. (*Id.* at 117.) Cooper nonetheless prohibited Plaintiff from reporting the incident, and said that Plaintiff "needed to make the situation work," or else "be the person that left before the other employees did." (*Id.* at 116-17.) Another time, Plaintiff was thwarted from filling out and submitting an accurate incident report when Cooper told him to label what was actually an accident, i.e. a truck rollover resulting in equipment damage, as a "near miss" instead. (*Id.* at 127-29.)

And in March of 2014, at the Tomoka Farms Landfill Project in Florida ("Tomoka Farms"), Superintendent Johnny Meier sent untrained employees into gaseous, hazardous conditions, namely a 20-foot deep, unsecured, unbenched, unshored portion of the landfill. (*Id.* at 129-30.) Plaintiff became aware of the dangerous situation when Meier showed him pictures of the site's progress, which included pictures of the employees entering the dangerous conditions. (*Id.* at 130.) Plaintiff was disturbed, and contacted Broggi, Cooper, and Site Manager Junos Reed separately to register his concern. (*Id.*) Broggi and Cooper told Plaintiff not only not to submit an incident report, but also to delete the pictures and not to divulge them to Reed. (*Id.*) Plaintiff told them that he had already sent Reed the pictures, and both became "furious," threatening Plaintiff's employment, and conveying to him that they were likely to fire him if he "did not get on board." (*Id.* at 131.) Concerned about his job security, and out of loyalty to his employer, Plaintiff acquiesced to Broggi and Cooper, and did not report this incident. (*Id.*)

In mid-May of 2014, at Tomoka Farms, Plaintiff noticed a lump in his neck that was rapidly increasing in size. (Lightner Dep., Doc. 48-1 at 80-81.) He went to a local hospital and was told by a doctor to have the growth examined immediately. (*Id.* at 81.) Plaintiff told Broggi

4

that he needed to have the growth looked at but, because he wanted to make certain that work was going as planned onsite, he said he would wait until his scheduled week off to see a doctor. (*Id.*) During his next scheduled time off, he flew home to Ohio to see his primary care physician to remove and biopsy the lump, which was later found to be benign. (*Id.* at 82, 85-86.) He did some work offsite while in Ohio, billing his time to the Tomoka Farms project because he did not have the cost code to a new project, of which there were several under discussion, including one in Volusia County, Florida for which he was expecting paperwork. (*Id.* at 84.)

On Thursday, May 29, 2014, Plaintiff spoke with Cooper in Cooper's office in Findlay, Ohio, and they discussed him needing three to four weeks of time off to recover after his lumpectomy. (*Id.* at 88.) Cooper seemed supportive. (*Id.*) The next day, Cooper called Plaintiff to notify him that Defendant had not been awarded a contract and that, because there was still no cost code for a new project and, because Plaintiff refused to use paid time off or vacation, and because Defendant did not want Plaintiff billing for either Tomoka Farms or general overhead, Plaintiff was likely to be furloughed. (*Id.* at 90-91.) This struck Plaintiff as odd, because he was told by one of the untrained workers that the worker was being sent to a project on the west coast of the United States, while another untrained worker said the worker was going to the very project Cooper just said had not been awarded to Defendant. (*Id.*) In any event, on Monday, June 2, 2014, Cooper informed Plaintiff that he was being furloughed.[1] Cooper went to pick up Defendant's property in Plaintiff's possession the next day. (*Id.* at 93-94.)

### B. Procedural History

Plaintiff initiated this lawsuit on October 27, 2014, asserting causes of action for interference in violation of the Family Medical Leave Act ("FMLA"), retaliation in violation of

---

[1] This Opinion uses "terminate," "furlough," "discharge" (and their variants) interchangeably.

5

FMLA, and a violation of Ohio common law for wrongful discharge in contravention of public policy. (Compl., Doc. 1 at 2-4.) Plaintiff seeks damages amounting to more than $75,000 (including compensatory damages, back wages, interest, fringe benefits, and fees), and reinstatement to his prior position of employment. (*Id.* at 5.) Defendant now moves for summary judgment on all claims. (Def.'s Mot. for Summ. J., Doc. 36.)

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law." *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251-52). In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party. *United States S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013). The court reviewing a summary judgment motion need not search the record in an effort to establish the lack of genuinely disputed material facts. *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404 (6th Cir. 1992). Rather, the burden is on the nonmoving party to present affirmative evidence to defeat a properly supported motion, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.1989) (citation omitted), and to designate

6

specific facts that are in dispute. *Anderson*, 477 U.S. at 250 (citation omitted); *Guarino*, 980 F.2d at 405.

To survive the motion, the nonmoving party must present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). As such, the mere existence of a scintilla of evidence in support of the opposing party's position is insufficient to survive the motion; there must be evidence on which the jury could reasonably find for the opposing party. *See Anderson*, 477 U.S. at 251 (citation omitted); *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995).

### III. ANALYSIS

### A. The FMLA: Theories of Recovery

As to Plaintiff's FMLA claims, the Sixth Circuit recognizes two discrete theories of recovery:

> (1) the so-called "interference" or "entitlement" theory arising from [29 U.S.C.A.] § 2615(a)(1), and (2) the "retaliation" or "discrimination" theory arising from § 2615(a)(2). *Hunter* [*v. Valley View Local Sch.*, 79 F.3d [688,] 691; *Arban,* 345 F.3d at 400–01. Although we have held that a claim for retaliatory discharge is cognizable under either theory,[6] the requisite proofs differ. The interference theory has its roots in the FMLA's creation of substantive rights, and "[i]f an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred," regardless of the intent of the employer. *Arban* [*v. West Pub. Corp.*], 345 F.3d [390,] 401. The central issue raised by the retaliation theory, on the other hand, is "whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason." *Edgar v. JAC Prods., Inc.,* 443 F.3d 501, 508 (6th Cir.2006) (citation and internal quotation marks omitted). In contrast to the interference theory, "[t]he employer's motive is relevant because retaliation claims impose liability on employers that act against employees specifically *because* those employees invoked their FMLA rights." *Id.*

*Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012). The Court discusses each theory seriatim.

7

1. Interference

The FMLA entitles qualifying employees to up to twelve weeks of unpaid leave each year if the employee has a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). To establish a prima facie case of an FMLA-interference claim, a plaintiff must demonstrate that: "(1) she was an eligible employee, (2) the defendant was an employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave the employer notice of her intention to take leave, and (5) the employer denied or interfered with the employee's FMLA benefits to which she was entitled." *Wallace v. FedEx Corp.*, 764 F.3d 571, 585 (6th Cir. 2014) (quoting *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006) (alterations omitted)).

Defendant argues that Plaintiff's interference claim fails as a matter of law because he was never denied leave, which leaves the fifth prong of the FMLA interference test unsatisfied. According to Defendant, when an employee has been granted the leave to which he was entitled and there is no evidence that he would have been denied additional leave if he requested it, the employee's claim is not cognizable under an interference theory, but only under a retaliation theory. (Doc. 36-1 at 20-21 (citing *Seeger*, 681 F.3d 274, 282 (6th Cir. 2012).) Defendant bases this argument on its assertion that Plaintiff did not apply for or request FMLA leave prior to being furloughed and, therefore, he was not denied any requested leave under the FMLA. (*Id.* at 21.)

Plaintiff retorts that, under the FMLA, the key question is whether the employee provided the employer with information sufficient to reasonably apprise the employer of the employee's request for time off due to a serious health condition. (Doc. 48 at 24-25 (citing *Brohm v. JH Props., Inc.*, 149 F.3d 517, 523 (6th Cir. 1998) (quoting *Manuel v. Westlake Polymers Corp.*, 66

8

F.3d 758, 764 (5th Cir. 1995)).) Thus, argues Plaintiff, whether Plaintiff brought up his need for leave with Defendant's human resources department is not dispositive of whether Defendant had notice of Plaintiff's need for leave.

But whether Plaintiff ever spoke with human resources is off topic; notice is not a direct concern here.[2] Defendant's assertion that it never thwarted Plaintiff from exercising his FMLA rights, however, is topical. It is also fatal to the interference claim. In *Seeger*, the Sixth Circuit considered an appeal of a district court's grant of a defendant's motion for summary judgment in a FMLA lawsuit in which the plaintiff made no distinction between his retaliation and interference claims, and it affirmed the district court's decision to conflate the two and address one claim of retaliation. *Seeger*, 681 F.3d at 280. This is because, as spelled out in *Arban*:

> The "entitlement" or "interference" theory is derived from the FMLA's creation of substantive rights. If an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred. *King v. Preferred Technical Grp.*, 166 F.3d 887, 891 (7th Cir. 1999).
>
> > The issue is simply whether the employer provided its employee the entitlements set forth in the FMLA—for example, a twelve-week leave or reinstatement after taking a medical leave. Because the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer.
>
> *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir. 1998).

345 F.3d at 401.

---

[2] Insofar as Defendant insinuates that Plaintiff's needing time off to recover after a lumpectomy might not have been a qualifying event under the FMLA (*see* Doc. 36-1 at 24 ("[Plaintiff] may have *contemplated* needing FMLA leave in the future, pending the results of his biopsy, but arguably this episode was not a FMLA event.")), the Court resolves the argument, as it must, in the non-movant's favor. *See Sierra Brokerage*, 712 F.3d at 327. And to be sure, an employee need not utter magic words to notify an employer of a FMLA leave request. *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 421 ("[T]he critical test for substantively-sufficient notice is whether the information that the employee conveyed to the employer was reasonably adequate to apprise the employer of the employee's request to take leave for a serious health condition that rendered him unable to perform his job.") (citations omitted).

Here, although Plaintiff alleges that he was terminated because he indicated he needed leave, nowhere does he allege that his requests for leave were denied or that his rights under the FMLA were ever frustrated. And how could they have been? He was terminated merely two business days after apprising Defendant of his need for medical leave. (Doc. 48 at 6.) Because Plaintiff has not alleged that Defendant ever denied or otherwise interfered with his rights under the FMLA, the Court finds that Plaintiff's interference claim fails as a matter of law, and it thus **GRANTS** Defendant's motion as to Plaintiff's FMLA-interference claim.

### 2. Retaliation

In addition to a FMLA-interference claim, a plaintiff may recover under the FMLA for retaliation. Plaintiff has not set forth direct evidence of discrimination, so the familiar *McDonnell Douglas* burden-shifting framework applies. *See Demyanovich*, 747 F.3d at 432; *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 313-16 (6th Cir. 2001). Under this framework, a plaintiff first bears the burden to make out a prima facie case of FMLA retaliation by showing that: "(1) she availed herself of a protected right under the FMLA by notifying [the employer] of her intent to take leave, (2) she suffered an adverse employment action, and (3) that there was a causal connection between the exercise of her rights under the FMLA and the adverse employment action." *Edgar*, 443 F.3d at 508.

Once the employee satisfies these three requirements, "the burden shifts to the employer to proffer a legitimate, nondiscriminatory rationale for discharging the employee." *Id.* The plaintiff must then rebut the defendant's legitimate nondiscriminatory reason for termination by pointing to evidence that the reason was pretextual. *See Demyanovich*, 747 F.3d at 433. A plaintiff may establish pretext by showing that the proffered nondiscriminatory reason had no basis in fact, was insufficient to motivate the adverse action, or did not actually motivate the

10

action. *Harris v. Metro. Gov't of Nasvhille & Davidson Cnty., Tenn.*, 594 F.3d 476, 486 (6th Cir. 2010). The inquiry is informal and commonsense. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009) (noting that "it is important to avoid formalism in its application, lest one lose the forest for the trees. Pretext is a *commonsense* inquiry: did the employer fire the employee for the stated reason or not?") (emphasis added).

Defendant argues that Plaintiff's prima facie case is unsatisfied as to causation and that, even if Plaintiff had satisfied his burden, he cannot rebut Defendant's legitimate, nondiscriminatory rationale for discharging Plaintiff, i.e. a workforce reduction. This memorandum discusses the arguments in turn.

### a. *Plaintiff Has Met His Prima Facie Burden to Prove Causation*

The Court finds that Plaintiff has met his prima facie burden as to causation based on temporal proximity alone. Plaintiff was furloughed merely two business days after notifying Defendant that he might need to take medical leave. Temporal proximity is, expectedly, especially germane to determining causation, and courts regularly find that temporal proximity alone is sufficient to meet this prong of a plaintiff's prima facie case. *See Skrjanc*, 272 F.3d at 314 (finding proper the district court's concluding that "the proximity in time between [the plaintiff's] request for leave and his discharge constitutes indirect evidence of a causal connection between his exercise of a right under the FMLA and the adverse employment decision.") (citing *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990)).

Because of the extreme proximity between the two events, merely two days, the Court finds that there is enough evidence to submit to a factfinder to determine whether there was a causal connection between Plaintiff's termination and his notifying Defendant of his intent to exercise his FMLA rights.

b. *Defendant's Proffered Rationale Might Be Pretextual*

Pretext may be inferred from "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in an employer's proffered reasons. *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quoting *Olson v. Gen. Elec. Aerospace*, 101 F.3d 947, 951-52 (3rd Cir. 1996)). The ultimate question is: "did the employer fire the employee for the stated reason or not?" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009). At summary judgment, the question is simply "whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation." *Id.*

Defendant asserts that it discharged Plaintiff due to a reduction in force. Such reductions have regularly been found to be legitimate, nondiscriminatory reasons for discharge and, in the Sixth Circuit, because a workforce reduction is "the most common legitimate reason for . . . discharge[,] . . . the plaintiff must provide additional direct circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Geiger v. Tower Auto.*, 579 F.3d 614, 624 (6th Cir. 2009) (citations and internal quotation marks omitted); *cf. Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1221 (2d Cir. 1994) ("But sometimes the validity of a company's legitimate reduction masks, in an individual case, a discriminatory animus.").

In rebuttal to Defendant's arguments, Plaintiff asserts: that Defendant has not produced a single document discussing the need to eliminate his position; that the reduction in force was a reduction of one, i.e. Plaintiff's position was the *only* position eliminated; that Cooper has never recommended any other employee be eliminated in a workforce reduction; that, at the time of his termination, Defendant had posted a listing for a site superintendent position that it did not remove until months after Plaintiff was terminated (Cooper Dep., Doc. 48-8 at 23, 28); that

12

Plaintiff's work performance was uniformly good to excellent; that there were actually no geographical limitations for site superintendents (*Id.* at 68); and that Cooper changed his testimony under oath, walking back his prior testimony that he and Broggi discussed terminating Plaintiff after learning about his need for medical leave instead of before. (*Id.* at 61.)

The above evidence demonstrates the sorts of inconsistencies and implausibilities proving pretext. What kind of "workforce reduction" is a reduction of one? Why is there no tangible evidence of the planned reduction? If Defendant discharged Plaintiff to save costs, why would it have listed an open position at Plaintiff's job title and skill level months before *and* after discharging him? Just how convenient is it that Cooper changed his testimony to say that the plan to terminate Plaintiff was hatched before, rather than after, Plaintiff notified Defendant that he needed medical leave? A juror might rightly ask herself these questions, among others, and determine that Defendant's proffered rationale for discharging Plaintiff was pretextual. *See Morgan*, 108 F.3d at 1323. As such, the Court **DENIES** Defendant's motion as to Plaintiff's FMLA-retaliation claim.

### B. Wrongful Termination in Contravention of Public Policy

Because "at-will employment may be terminated by the employer at any time for good cause, bad cause, or no cause at all," *Sutton v. Tomco Machining, Inc.*, 950 N.E.2d 938, 942 ¶ 7 (Ohio 2011), discharging an employee does not normally confer a cause action for damages. But:

> if an employee is discharged . . . in contravention of a clear public policy articulated in the Ohio or United States Constitution, federal or state statutes, administrative rules and regulations, or common law, a cause of action for wrongful discharge in violation of public policy may exist as an exception to the general rule.

*Dohme v. Eurand Am., Inc.*, 956 N.E.2d 825, 829 ¶ 11 (Ohio 2011). To succeed on a claim of wrongful discharge in contravention of public policy, a plaintiff must prove each of the following:

> 1. That clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element).
>
> 2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element).
>
> 3. The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element).
>
> 4. The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element).

*Id.* ¶¶ 12-16 (citing *Painter v. Graley*, 639 N.E.2d 51, 57 fn.8 (Ohio 1994) (quotation marks and citations omitted). The clarity and jeopardy elements are conclusions of law, while the causation and overriding-justification elements are findings of fact. *Id.* ¶ 17 (citation omitted).

Parties do not dispute that Plaintiff has met his burden as to the clarity element. The statutes Plaintiff cites to support his claim of wrongful discharge are sections 4101.11, 4101.12 and 3734 of the Ohio Revised Code, and 29 C.F.R. §§ 24.102 and 1910.120. (Compl., Doc. 1 ¶¶ 30-31;[3] Response in Opp'n, Doc. 48 at 27), which require employers to ensure a safe work environment, and which evince a clear public policy, i.e. promoting workplace safety. *Blair v. Honda of Am. Mfg., Inc.*, No. 14-01-33, 2002 WL 396531, at *6 (Ohio Ct. App. 3d Dist., March 14, 2002) ("The Ohio Supreme Court has determined that '[t]he public policy of this state demands that employees be provided with a safe work environment and that unsafe working

---

[3] The Complaint refers to sections 4101.01 and 4101.02 of the Ohio Revised Code, which have been repealed. The briefing indicates that those are certainly typos, and the Court will treat Plaintiff's claims as arising under sections 4101.11 and 4101.12 of the Code.

14

conditions be corrected.'") (quoting *Kulch v. Structural Fibers, Inc.*, 677 N.E.2d 308, 322 (Ohio 1997)).

Defendant nevertheless contends that Plaintiff cannot survive summary judgment as to the jeopardy, causation, or lack of overriding justification elements of this claim. The Court discusses the elements in turn.

### 1. Plaintiff Has Satisfied the Causation Element

There is no apparent, meaningful difference between the causation elements of Plaintiff's claims under the FMLA and the common law. *Cf. Edgar*, 443 F.3d at 508 (a plaintiff must prove "that there was a causal connection between the exercise of her rights under the FMLA and the adverse employment action."); *with Collins v. Rizkana*, 652 N.E.2d 653, 657 (Ohio 1995) (a plaintiff must prove that her termination "was motivated by conduct related to the public policy").

Although it purports to do so, Defendant's motion does not squarely address causation, but rather skips ahead to discuss the overriding legitimate business justification element instead (see pt. 2, *infra*) and, oddly, relies on cases that are inapposite.[4]

The Court finds that Plaintiff has set forth sufficient evidence upon which a factfinder could conclude that Defendant terminated him because of his endeavoring to promote workplace safety. Cooper's becoming upset after Plaintiff notified him of the dangerous incompetence of onsite employees is probative. Also probative is Cooper telling Plaintiff that he needed to "make

---

[4] There is no discussion of causation in the public policy claim, e.g., in *Baker v. Medtronic, Inc.*, No. 1:07-CV-00286, 2009 WL 948800 (S.D. Ohio, Apr. 2, 2009), which was dismissed after the court found the *jeopardy* element unsatisfied. 2009 WL 948800, at *10. *Lartey v. Shoprite Supermarkets, Inc.*, No. 08 Civ. 8272, 2011 WL 2416880 (S.D.N.Y., June 14, 2011), is likewise not on topic, as it concerned race discrimination and retaliation claims under Title VII, 42 U.S.C. §§ 2000e, *et seq.*—the discrimination claim was dismissed because it was based entirely on hearsay, 2011 WL 2416880 at *3, while the retaliation claim was dismissed because the employer was not aware that the plaintiff was being unfairly treated, *id.* at *2—neither of those concerns are present here.

15

the situation work" or else "be the person that left before the other employees did." (Lightner Dep., Doc. 48-1 at 116-17.) That Broggi and Cooper explicitly forbade Plaintiff from reporting safety incidents, and that they overtly and unequivocally threatened his job if he did so, are also probative. In sum, the Court finds that Plaintiff's allegations are enough upon which a factfinder could rightly conclude that Plaintiff was terminated because he was trying to promote workplace safety, which means the Court finds that Plaintiff has met the causation element of this claim.

   2. <u>Plaintiff Has Satisfied the Lack of Overriding Legitimate Business Justification Element</u>

As with causation, there is no meaningful difference between this element of Plaintiff's common and federal law claims, the element of federal law here being the "legitimate nondiscriminatory" movement in *McDonnell Douglas*'s burden-shifting three-part suite. *Cf. Alexander v. Cleveland Clinic Found.*, No. 95727, 2012 WL 1379834, at *8 ¶ 49 (Ohio Ct. App. 8th Dist., Apr. 19, 2012) ("Even though [the plaintiff] has the reciprocal burden to demonstrate causation and the lack of an overriding justification, once [the defendant] shows otherwise, we find that Alexander has been able to meet his burden to overcome summary judgment"); *with Chen*, 580 F.3d at 400 ("The burden is first on the plaintiff to demonstrate a prima facie case of race discrimination; it then shifts to the employer to offer a legitimate, non-discriminatory explanation for its actions; finally, the burden shifts back to the plaintiff to show pretext-i.e. that the employer's explanation was fabricated to conceal an illegal motive.") (citations omitted); *and Kirk v. Shaw Envtl., Inc.*, No. 1:09-cv-1405, 2010 WL 2162018, at *11 (N.D. Ohio, May 25, 2010) (in an Ohio claim of wrongful discharge, "[o]nce an employer presents a legitimate justification for its discharge of an employee, a plaintiff must show that an employer's offered nondiscriminatory reason for the termination is pretextual.") (citation omitted).

16

Defendant's and Plaintiff's arguments here are the same as with a pretext analysis under *McDonnell Douglas*, namely that Defendant's rationale is a workforce reduction, which Plaintiff argues is pretextual, *see* § III(A)(2)(b), *supra*. The Court's analysis is also the same, *see id.*, and, therefore, the Court finds that Plaintiff has satisfied this element.

### 3. Plaintiff Has Satisfied the Jeopardy Element

Defendant argues that Plaintiff cannot satisfy the jeopardy element because the statutes cited giving rise to his claim for relief provide adequate remedies for the wrongs alleged. The provision of adequate remedies in the statute giving rise to a claim for wrongful termination renders the wrongful-termination claim unviable as to the jeopardy element of a court's analysis. *See, e.g., Leininger v. Pioneer Natl. Latex*, 875 N.E.2d 36, 38 ¶ 27 (Ohio 2007) ("It is clear that when a statutory scheme contains a full array of remedies, the underlying public policy will not be jeopardized if a common-law claim for wrongful discharge is not recognized based on that policy."); *see also Wiles v. Medina Auto Parts*, 773 N.E.2d 526, 531 ¶ 15 (Ohio 2002) ("Simply put, there is no need to recognize a common-law action for wrongful discharge if there already exists a statutory remedy that adequately protects society's interests.") (citations omitted).

Defendant asserts that there is no need to recognize a common-law cause of action for wrongful discharge here, because OSHA "provides a remedy sufficient to protect its underlying public policy." (Doc. 36-1 at 11 (citing 29 U.S.C. § 660(c)(1).[5]) *See, e.g., Carpenter v. Bishop Well Servs. Corp.*, No. 2009CA00027, 2009 WL 4682253, at *4 ¶ 36 (Ohio Ct. App. 5th Dist.,

---

[5] (c) Discharge or discrimination against employee for exercise of rights under this chapter; prohibition; procedure for relief
    (1) No person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself or others of any right afforded by this chapter.

17

Dec. 7, 2009) (finding the *Leininger* standard unmet because "the federal OSHA statutes in [29 U.S.C. § 660(c)] provide for judicial review and a judicial remedy, as well as reinstatement, back pay," etc.).[6]

Plaintiff points to decisions finding otherwise. *See, e.g., Pytlinski v. Brocar Prods., Inc.*, 760 N.E.2d 385, 388 (Ohio 2002) (recognizing a plaintiff's claim "that he was discharged in violation of Ohio public policy favoring workplace safety because the discharge was predicated upon his complaints regarding workplace safety."); *see also Blair*, 2002 WL 396531, at *6 ("The Ohio Supreme Court has determined that '[t]he public policy of this state demands that employees be provided with a safe work environment and that unsafe working conditions be corrected.'") (quoting *Kulch v. Structural Fibers, Inc.*, 677 N.E.2d 308, 322 (Ohio 1997)).

The Court finds that Plaintiff's argument prevails. *Pytlinski* is still controlling, it is still good law, and it could not be clearer: "Ohio public policy favoring workplace safety is an independent basis upon which a cause of action for wrongful discharge in violation of public policy may be prosecuted." 760 N.E.2d at 388. *See Blackburn v. Am. Dental Ctrs.*, 22 N.E.3d 1149, 1158 ¶ 29 (Ohio Ct. App. 10th Dist. 2014) ("We . . . find the trial court erred in concluding that there is no Ohio public policy against retaliation by employers against employees who report workplace conditions that jeopardize . . . safety. . . . In so holding, . . . we specifically disagree with the Sixth District's holding in *Whitaker v. FirstEnergy Operating Co.*, [No. OT-12-021, 2013 WL 4792860, at *6 ¶ 25 (Ohio Ct. App. 6th Dist., Sept. 6, 2013)], which found those

---

[6] Defendant also cites *Whitaker v. First Energy Nuclear Operating Co.*, No. OT-12-021, 2013 WL 4792860, at *6 ¶ 25 (Ohio Ct. App. 6th Dist., Sept. 6, 2013) for this proposition, but it does so in error. *Whitaker* found that sections 4101.11 and 4101.12 failed for lack of clarity, 2013 WL at *6 ¶ 25 ("The statutes are very general and broad. Again, *Dohme* requires citation to specific, clear law."), but since Defendant has not argued that the relevant statutes are not sufficiently clear, the Court will not engage in a clarity analysis *sua sponte* and, even if it did, it would find that, as discussed below, *Whitaker* was flat-out wrongly decided. *See, e.g., Blackburn v. Am. Dental Ctrs.*, 22 N.E.3d 1149, 1158 ¶ 29 (Ohio Ct. App. 10th Dist. 2014), discussed below.

statutes too 'general and broad' to support such a claim") (quoting *Whitaker*, 2013 WL 4792860 at *6 ¶ 25). *See* 2013 WL 4792860 at *11 ¶ 51 ("In *Pytlinski,* the Ohio Supreme Court included R.C. 4101.11 and 4101.12 in its list of statutes that comprise 'the abundance of Ohio statutory and constitutional provisions that support workplace safety and form the basis for Ohio's public policy.' *Pytlinski* at 79, 760 N.E.2d 385. While the majority determines that these statutes are 'very general and broad,' its argument is belied by the holding in *Pytlinski*.") (Yarbrough, J., dissenting in part). Because *Pytlinski* provides for a standalone cause of action for wrongful discharge full stop, the Court finds that Plaintiff has met the jeopardy element and, thus, **DENIES** Defendant's motion as to Plaintiff's claim of wrongful discharge in contravention of public policy.

## IV. CONCLUSION

For the aforementioned reasons, the Court **GRANTS in part and DENIES in part** Defendant's Motion for Summary Judgment: the Court **GRANTS** the motion as to FMLA interference, **DENIES** the motion as to FMLA retaliation, and **DENIES** the motion as to wrongful discharge in contravention of public policy.

**IT IS SO ORDERED.**

    s/Algenon L. Marbley
**ALGENON L. MARBLEY**
**Dated: November 14, 2016**    **UNITED STATES DISTRICT COURT**

19